at all. May I please the court, Marshall Tinkle for the appellant, Shelley Flood. May I reserve three minutes for a rebuttal, please? Yes. The principal claim here is employment discrimination on the basis of sexual orientation in violation of the Maine Human Rights Act. This discrimination case is somewhat unusual because the district court specifically found that the employer, Bank of America, had in fact discriminated against Shelley Flood and did set her up for a wrongful discharge, or at least that jury could so find, which for summary judgment purposes amounts to the same thing. But nevertheless, granted summary judgment against the employee on the sole premise that the bank's actions against her were not sufficiently egregious to be actionable. And there are, I submit, at least five ways that the bank committed actionable discrimination against Shelley Flood. I'd like to discuss three of them now. First and foremost, the bank fired her. It's clear from the record that they fired her. The bank has consistently stated Counsel, on that point, it appears that the district court took the view that the issue before her was really whether there was a constructive discharge, not an actual discharge, but a constructive discharge. I gather that is not your theory. You are not arguing constructive discharge. It is your position that the termination on the theory of abandonment was an actual discharge, and that is what you are contesting. Is that correct? That's correct, Your Honor. And that's based on the bank's own statements that they terminated her, on Shelley Flood's consistent statements that she did not resign. She said in her deposition testimony that if I had wanted to resign, I would have stated I resigned. She did explain the reasons why she was not at the bank for six days, and she did that on September 30th before she was terminated. So for summary judgment purposes, it has to be assumed that Shelley Flood was actually discharged, which is an adverse employment action no matter how you slice it. I thought the bank's position was that she was actually discharged, but that she was discharged for job abandonment. That's right. Because she had failed to report for work for a number of days, and indeed, I don't see whether there is any factual controversy that she had failed to report for work. Right. That's just not how the district court looked at it. I don't know whether it seemed to have just... On De Novo Review, we're not that concerned with how the district court looked at it. But what I'm struggling with is if she was fired for job abandonment, and the evidence is clear that she didn't come into work and that her absence wasn't excused, then you can't And I'm struggling with trying to find evidence from which a reasonable jury could infer a pretext. Well, I think it's very clear that the jury could find pretext for all the same reasons that the district court said that they could find pretext for setting her up for a wrongful discharge. But pretext is usually found because the employer offers a reason, which can be demonstrated to be invented or false. Here, the reason, the facts underlying the reason are admittedly true. She didn't appear for work. But that's still... And her absence was unexcused. It seems to me that's a classic case of constructive discharge on your theory, but you keep disclaiming that. So we can't go there. Well, I think that under a constructive discharge theory, we could still prevail. But you don't have to get to that point because under the McDonnell-Douglas framework, you can show pretext. There are numerous cases where there's been the same situation where an employer has claimed to terminate for reasons of job abandonment. And the courts have said, well, there's an issue of pretext. This is not really unlike the main law court case of Watt v. Unifirst, where the employee was terminated for assault. And there's no question that she took a metal bar and struck her co-worker who was harassing her. And the court said, well, it may be true that that happened, but you could still say that there was pretext, that that wasn't the real reason why she was fired. Just factually, as I understand it, she chose on her own to absent herself from work. There was an attempt to get from her an explanation. And she was given a deadline that she had to contact a particular individual by a certain date. My understanding is that she did contact, not that person, but somebody else in the company, explaining her situation and why she felt she could not return to work under the existing circumstances. And then I thought there was sort of an exchange took place between her and officials in the company before she was finally terminated. Isn't that correct? I mean, there was some time lapse between that deadline and the date that she was actually terminated. Isn't that correct? There wasn't really a time lapse, Your Honor. She submitted her letter explaining the reasons why she felt she was unable to go back on September 30th. They posted on October 1st, without talking to her, without going through the steps, that according to the banks only after David they were supposed to go through, and posted on October 1st that she was fired. So the discharge date was October 1st? Yes. She wasn't notified on that date officially, but she found out about it because it was posted online. So that's the first ground, which I think is the most obvious. Second, shortly before her termination, she was given a warning in writing that carried the threat of termination. And also when she was handed the warning, she was told that she was only one step away from being walked. Under Maine law, it's clear that this sort of action is covered under the Maine Human Rights Act, which is broader than Title VII. The case of King v. Bangor Federal Credit Union is directly on point. Counsel, I think it would be helpful, some of your adverse consequences claims, I think implicate the sort of traditional sort of materiality type of analysis, do not depend on this very expansive language of the Maine Human Rights Act. Some of your adverse consequences claims do seem to hinge on that expansive language. Could you identify for us which ones survive, would survive under the traditional language and which require the application of the expansive language? Yes, Your Honor. First of all, obviously, termination is a clear example. The warning is under the King case. They put that under terms and conditions, which is also in Title VII. Transfer, promotion are directly mentioned in the Maine Human Rights Act, but are not mentioned in Title VII specifically, but I think it's understood that in Title VII they would be covered. More in general, anything that relates directly or indirectly to employment would include other steps that the bank took to, in the process of trying to nudge her out the door, so to speak, would include the warning that was later retracted. It could include the warning if it's decided that that's not a term or condition, and I think that just the totality of circumstances under Maine law could be considered enough to be discrimination because of her sexual orientation relating to, either directly or indirectly, to her employment. Well, you have a claim that you characterize as, you say that the bank's actions in the aggregate constitute an adverse employment action. Is that somehow different than a hostile environment claim, hostile work environment claim? Is that something different, this sort of aggregate claim? I think that the aggregate claim can be considered hostile environment, but it could also, you could separate it out and say that if it's not, if it doesn't arise to the level under federal law of hostile environment, it should arise to that level under the more expansive language in the state act. You said that she was prohibited from socializing with her partner, and I think you also asserted that others, in other types of couples, were not subject to that same prohibition. That's correct. Is that, would you consider that a condition under the King decision? It could be considered a term or condition of employment, or it certainly was something that related directly or indirectly to her employment. So did you provide any evidence for, to support the assertion that other couples were allowed to socialize? Because I didn't see it. That was in her affidavit. That was based on her observations, and the district court found that that met the threshold evidentiary level. So I just would like to emphasize in the time left that maybe I'll speak about defamation on rebuttal, but under the main Human Rights Act, courts should be particularly cautious about granting summary judgment against employees. Last year, the law court held in Trott v. Goodall Hospital that they emphasized that discrimination claims hinge on circumstantial evidence, which is generally for the fact finder to decide. This court has said pretty much the same thing, and we're just asking the court to follow its own precedents and main precedent. Thank you. Good morning, Your Honors. My name is Caroline Turcotte, and I represent the Defendant Appellee's Bank of America Corporation and FIA Card Services. As to Ms. Flood's claims, the district court below, through the report and recommendation of Magistrate Judge Kravchuk, as well as Judge Singel's orders affirming the report and recommendation and denying Flood's motion, rightly granted Defendant's motion for summary judgment and found there to be no genuine issue of material fact. And, Your Honors, unless you prefer I jump into any particular issue, I'd like to address the issues that Mr. Tinkle has presented in turn. First, as to the issue of job abandonment, the facts on the record are abundantly clear that Ms. Flood abandoned her position. Ms. Flood reported to work on September 22nd as normal. She prepared her things and completed certain projects so that she would not burden her co-workers. She did not report to work the next day. In fact, she did not report to work for the next eight days. At no time during that period did Ms. Flood contact her supervisors. She did not contact the bank's... Counselor, excuse me. I understand that to be true. I understand that she was given a deadline to explain her absence and in response to that deadline she did explain her absence. There's no suggestion in there that she wanted to resign or leave her employment. Her response was that she had left because of certain conditions at work that she found unacceptable and she expressed the hope that they could be addressed. What is it about that letter that constitutes an abandonment? Your Honor, first of all, the letter she received was from her direct manager, Jeremy Trenier. In that letter he asked that she contact him by the... But you never made an issue of the fact that she responded to somebody else, have you? Your Honor, she didn't respond to the letter. Instead, she wrote a letter to Diana Castle, her unit manager, in which she complained of discrimination. She did not state that the discrimination was the reason why she left her employment nor did she express any interest in returning to her job or another job at the bank. Thereafter, Your Honor, the bank's HR department did reach out to her on numerous occasions. Although Ms. Flood claims that she returned some of those calls, the fact is that as of, I believe, October 15th, the HR department continued to contact her and Ms. Flood admitted at her deposition that she did not return their calls after that date. Thereafter, in a letter dated November 4th of 2011, I believe, the bank terminated her employment effective October 1st. I think that's the key distinguishing factor between what Mr. Tinkle was saying. The letter terminated her effective October 30th, September 30th, I apologize, because that was the deadline she had to respond to Mr. Trenier's letter. Well, if she was already terminated October 1st, why was the bank continuing to try to engage her in an attempt to understand what her concerns and problems were? Again, Your Honor, she was not terminated until November. It was retroactive to October 1st by virtue of that being the deadline that she had. So when was the decision made to terminate her? I don't know if the record establishes when the decision was made. It sounds like you're saying it was made in November. That's my understanding, Your Honor. So let's look at the issue the way that your brother is trying to frame it. He's not arguing constructive discharge. He's saying, in effect, that despite the fact that she had these unexcused absences, and despite the fact that she didn't respond to these attempts to reach out to her, that she would not have been discharged but for the discriminatory animus of which the district court found evidence. I understand that's Mr. Tinkle's position. Yeah. And for purposes of summary judgment in the McDonnell-Douglas formulation, why doesn't that work? Your Honor, I think there simply is no evidence of pretext in this case. But there's evidence of discriminatory animus. So doesn't that color any action that the bank takes towards her? I disagree, Your Honor, in particular because although the bank does not agree with the finding of animus, that finding of animus was related more specifically to the warning and the other terms and conditions of which Ms. Flood complained. There really was no discussion speaking to pretext for job abandonment because the court affirmatively found that it was. No, pretext for termination, not pretext for job abandonment. I'm sorry, pretext for termination. For termination, but all of those other things. Again, viewing the evidence most favorably to the plaintiff, taking all inferences favorable to her, why couldn't a reasonable fact finder say they were, for a matter of weeks leading up to this termination, setting her up for a discharge, either by forcing her out or finding some reason to fire her, and when she stopped reporting to work, she played right into their hands, and they jumped on that pretext and fired her for that reason? Your Honor, I don't believe that that record supports that conclusion. However, as it relates to the termination specifically, there is no evidence that Ms. Flood was treated differently than any other employee in terms of the reasons for her termination. Moreover, in terms of animus, the court focused on Diana Castle. However, the record on the termination is very clear that Ms. Castle did not make the termination decision, nor did she make the recommendation. The record does not identify specifically who made that decision, but it's clear that it was the HR representatives who handled the matter leading up to her termination for job abandonment who were in charge of that issue. Your Honors, if I may move on to the verbal warning, and specifically to the King case. Ms. Flood has applied a very broad interpretation, to say the least, of the King case. The King case was a constructive discharge case, and that is the proposition for which Magistrate Judge Kravchuk cited that case. In that case, there was an employee of a bank who had a breathing-related disability. She found that she could not work in an environment in which her coworkers and the employees were smoking. On one occasion, she left the room, apparently, went to her supervisor, and complained about this. Her supervisor, in return, told her, in essence, get back to work or you're fired. And under those specific facts, the court found that there was no evidence of constructive discharge because there was job accommodation available, accommodation of her disability. The court further went on in a single paragraph at the end of the case to say that while the facts did not lead to a constructive discharge, they were sufficiently abusive that they were actionable as discrimination. And I think that's the key there, Your Honors. The fact is that the employee there was subject to abuse, and the court referenced the use of derogatory comments made in the context of issuing what it determined to be an abusive reprimand. There's no denying that it's well-established under both state and federal law that even a single incident of abusive conduct can lead to actionable discrimination through a hostile work environment claim. Although the court in King did not label it as a hostile work environment claim, that is, in essence, what it was. The court focused there on the fact that there was abuse by the supervisor. And therefore, to expound on that case and to rely on it for the proposition that under Maine law, discipline and essentially any other action, be it adverse or not, is actionable as discrimination, I'd say is disingenuous in the least. Counsel, on the hostile work environment claim, I mean I understand that there is a lot of play in the concept of what is severe and pervasive enough to establish a hostile work environment claim. But she did describe here conditions that I think lasted from like around April of 2010 to September of 2010. But she experienced as daily harassment, people glaring at her. She was exposed to some unwelcome jokes as part of a discussion that she was having with her colleagues. She gets a warning that she feels is unfair about her work performance. And these take place with some consistency over this fairly extended period of time. Now why, given that description, why isn't there a factual determination for a jury as to whether that experience was severe or pervasive enough to constitute a hostile work environment? Your Honor, that is the case in large part because Ms. Flood's claims are largely conclusory. The actual facts in the record evidence that yes, there may have been unfriendly looks and glares. But in terms of the actions that give rise to this claim, there were four alleged comments, Your Honor. One, a positive comment about Ms. Flood's hairstyle. Another, a comment about the health benefits of adopting a vegan diet. Another, about whether it was appropriate to eat M&Ms. And a further reference to Ms. Flood's girlfriend when discussing whether or not she should have someone socializing around her desk during work hours. What about the, that she experienced, that she had had nothing but satisfactory work evaluations, and then subsequent to this event in April, the evaluations begin to change. She's now getting very negative evaluations about her work performance. That had never happened before. Isn't that all part of the experience that she's having during this period of time? I understand that to be part of her claims, Your Honor. However, first, factually, in and around the same time as this incident in April that she claims that Diana Castle saw a picture of her at an LGBT event. In and around the same time, Ms. Flood had just returned from a different position where the standards were different. Where she was based, she was evaluated on a different standard. And moreover, her direct manager changed at that time. It was clear from the record that at that time Michelle Tabet took over as her direct manager, who she, who was responsible for monitoring her calls and essentially rating her performance. I don't understand your assertion that the $200 fine levied in King was a hostile work environment claim. It was one comment. I understand, Your Honor. However, what the court focused on was it was an abusive comment. And my interpretation of that decision was that it was not being deemed discipline, but rather an incident of abuse involving a derogatory comment. And like a hostile work environment claim, that can give rise even from a single incident. So, again, it was the abuse there that was actionable, not the reprimand, so to speak. How was that any more abusive than unjustified reprimands, unjustified work performance evaluations, accepting production hours on the one hand and then re-computing them unfavorably to the employee without giving her a credible explanation that would justify the re-computation? I mean, aren't those all? If they occurred, and she says they did, aren't those all abusive actions? Well, Your Honor, we don't know what the actual abuse was in the King case because the court did not describe it. It only summarily deemed it an abusive reprimand involving derogatory statements. Such derogatory remarks are not evident in this case. Moreover, the facts that you're referring to is the bank's position that Magistrate Judge Kravchuk improperly credited those as facts when in fact they were simply the conclusory assertions of Ms. Flood. The record simply does not reflect that Diana Castle retroactively manipulated data. That was Ms. Flood's belief as to why she received a verbal warning, but the record does not reflect that. But she has firsthand knowledge and has stated in her affidavit that her work performance hours were computed in one way, that after that had been accepted, they were then unilaterally re-computed and that she never received a satisfactory explanation. So we've got to accept those facts as true. I can't see how you can fault the Magistrate Judge for accepting those facts. Well, I think when you're discussing the manipulation of data, again, that was her conclusory belief as to the verbal warning only. It had nothing to do prior to the receipt of the verbal warning in the first week of September. Ms. Flood had received a performance evaluation in August, but the evaluator for that was her direct manager, Jeremy Trenier, and he in that warning noted that she needed to improve efficiency specifically in the calculation of her AUX hours, meaning she was evaluated in essence on how many calls she took per day and she was expected to take calls at every minute of the day that she was working. And so any AUX time meant that it was time held against her. Jeremy Trenier noted that she needed to improve on that and that she was deficient in that area in August. He also noted in his performance review that he had counseled her on that issue many times before. And there's no suggestion here that Jeremy Trenier was taking direction from Diana Castle, that he was making that information up, or that he himself harbored any sort of animus toward Ms. Flood. Counsel, apparently there is evidence in the record that Ms. Flood, because she was finding her present circumstances unacceptable, decided to look for other jobs within the company. She initiated that process only to find that Diana Castle had advised the individual who might be responsible for helping her find another position that she was having trouble, Ms. Flood was having trouble meeting her current responsibilities. Is that in fact, is there evidence in the record to that effect? The record supports only, first of all, The only record is that Diana Castle admitted to have spoken to one recruiter on one occasion to report as to Ms. Flood's performance to date. That is it in terms of the record on this alleged failure. Was she asked for evaluation of Ms. Flood, or did she take the initiative herself to provide that evaluation? I don't know that that's in the record, Your Honor. Okay. And may I just speak in terms of the, if that is to Ms. Flood's failure to promote claim, as I've discussed in the brief, A, I would argue that Ms. Flood has waived that claim, but if this court were to consider it before the court, there's a prima facie burden that she must establish on a failure to promote claim, and there's far more to it than what she's put forward. She has not identified the positions for which she applied. She has not identified her qualifications for those positions, nor has she identified whether or not the individuals ultimately chosen for those positions were outside of her protected class. So even if it were before this court, she simply cannot meet her prima facie burden on that element of the case. So she said in an affidavit, we're told, that other couples were allowed to socialize and she wasn't. Yes, Your Honor. What do you say about that? Your Honor, Ms. Flood has not identified these individuals. Moreover, the issue with Carrie Flood's visits were not about socializing with her. It's very clear from the record, and Ms. Flood admitted at her deposition, that Diana Castle, nor anyone else in the bank, forbid her from socializing with her wife. The issue was that Carrie Flood would come to her desk during non-break periods, and there's simply no evidence that other employees were allowed to socialize with their spouses or significant others during periods of time when they were supposed to be on the phones. And I think that those are two very distinguishing features in terms of that issue. Is that it, Your Honors? Thank you. Mr. Trinkle, you said that you were going to get, during your rebuttal, to the defamation claim. And I may have missed it in your brief, but I have not got in my head a satisfactory answer to the defendant's claim that, by reason of a failure to object to the order of the magistrate judge, a defamation claim is limited to defamation by self-publication. I think the response to that is that on June of 2012, while we filed a timely motion to amend to add the defamation claim, it was opposed on the grounds of futility. By order of the court in August, the court granted the motion, granted count to the defamation claim in its entirety, and found that we had, in fact, stated a claim for defamation. So to the extent that the court went on to express some kind of a warning that it may construe the claim as drafted in a limited way, I don't think that it was necessary, and may not even have been feasible, to object to a ruling in our favor. It was only until the summary judgment motion, when the court actually ruled that the motion should be limited, or that the claim should be limited to this one statement of job abandonment, which we didn't have any problem with. That was what we were saying. But as far as who it was published to, I don't think that there's any authority in Maine. I don't think it's the law of Maine. I don't think it's required in notice pleading to say exactly who you're publishing to. No, it may not be required, but I understood from the defendant's brief, and I clearly haven't looked at the underlying papers, I understood from the defendant's brief that the magistrate judge, in granting your motion to amend to add a defamation count, limited that count to defamation by self-publication. Now, that's materially different from the account that you've just given me, and I'll investigate that. But you can understand that if the magistrate judge did limit your amendment in that way, then you would have had to either object to the district court or accept the limitation. I didn't view the ruling as limiting the claim. I viewed it as having a warning that the claim may be limited, but granting the claim in its entirety for what it was. Let me ask you quickly about your adverse consequence theory. You've cited instances of what you characterize as a failure to promote unfair evaluations, unfair warnings. Are those stand-alone adverse consequence type claims, which may rise or fail, if materiality is a governing standard on materiality, or are they also part of the hostile environment claim as well, so that they're not simply stand-alone claims?  I think that it all has to be viewed in its totality, and that the bank has been cherry-picking the facts, which would be fine if Shelley Flood had filed a motion for summary judgment. But, in fact, the facts are that Shelley Flood said that she found out very shortly after October 1st that they said that she had been terminated, that the HR officials were not the only ones who made the decision to terminate her. Ms. Castle admitted that she had input in that decision, and under Maine law that's enough to get to tie that in with the discriminatory animus. Thank you, Counsel. Thank you.